Argued and submitted June 12, affirmed August 18, 1980

In the Matter of the Compensation of
MARLOW,
*Respondent—cross-petitioner,*
*v.*
DEXTER WOOD PRODUCTS et al,
*Petitioners—cross-respondents.*
(WCB Case No. 78-7856, CA 16332, CA 16415)

615 P2d 402

Margaret H. Leek Leiberan, Portland, argued the cause for petitioners—cross-respondents. With her on the briefs was Lang, Klein, Wolf, Smith, Griffith & Hallmark, Portland.

Tim J. Helfrich, Eugene, argued the cause for respondent—cross-petitioner. With him on the briefs was E. B. Sahlstrom Law Offices, Eugene.

Before Schwab, Chief Judge, and Thornton and Richardson, Judges.

SCHWAB, C. J.

## SCHWAB, C. J.

The problems in this workers' compensation case involve trying to put an extremely ill-defined and informal working arrangement into legal pigeonholes. Was claimant an employe or an independent contractor when he was injured? Had claimant terminated that relationship, whatever it was, before he was injured? The Workers' Compensation Board resolved those issues in claimant's favor. We affirm.

■ On the employe-versus-independent-contractor issue, we agree with and adopt the well-reasoned opinion of the referee:

"Claimant answered a help wanted newspaper advertisement placed by Dexter Wood Products, (Dexter), a company that had contracted with a timber owner to cut down dead cedar and remove it by helicopter. By the advertisement, Dexter sought workers to cut shake bolts which claimant agreed to do for $50 a cord plus an additional $5 for each cord he helped load for transport. According to claimant, the agreement was verbal. According to Dexter, there was a written contract, signed by the parties, which was not produced at the hearing due to its loss in an alleged burglary. A form of contract, allegedly identical to the one signed, was submitted * * *.

"* * * * *

"Factors suggesting claimant was an independent contractor. Claimant had control over when he worked and how long each day. Claimant used his own methods in accomplishing the work and furnished his own equipment, including power saw, axe and fire equipment.[1] Claimant was paid by the unit, not by the hour. Claimant recruited other workers and formed a 'team' to cut and split wood.

"Factors suggesting claimant was an employee. Dexter specified the areas that were to be cut; specified the size of shake bolts to be cut; specified the quality of cedar that was acceptable and for which payment would be made and specified the manner in which the cedar was to be stacked and bundled for

---

[1] See n 2, infra.

helicopter shipment out of the woods.[2] Dexter did evaluate the quality of claimant's wood and did refuse to pay for some claimant had cut. Neither party was prevented from terminating the association without notice or further liability. The job had a potential duration of five years and was an ongoing basic employment activity of Dexter as opposed to an occasional or incidental part of Dexter's normal operation. There is no showing claimant was doing other jobs at the same time he was cutting for Dexter.

"Equivocal factors. While Dexter did not deduct Workers' Compensation premiums from claimant's compensation, the purported contract required it * * *. While a Dexter co-owner assumed claimant was an independent contractor due to the piece work method of payment, he testified that he, (the co-owner), '. . . basically supervised the whole show . . .'.

"While claimant did obtain assistants to help him, he did so only after getting Dexter's permission.

"Like most cases of this kind, there are factors indicating both types of status. The arrangement here was a loose unrestricted one, but I conclude that Dexter reserved considerable control over claimant as is illustrated by Dexter's requiring claimant to obtain permission to bring helpers to the job as well as the rather stringent quality control practiced. It is this right to control the details of the work * * * which convinces me that Dexter was an employer and claimant its employee."

Turning to the question of whether claimant had terminated his employment before he was injured, we find some facts that are agreed, clear or established, and others that involve considerable ambiguity or conflict in the evidence. The established facts are as follows: Claimant was injured on August 31, 1978. He was in the process of cutting down a tree. As the tree was falling, something—probably a broken branch—struck him in the forehead and knocked him to the ground.

[2] Dexter also supplied certain equipment used in connection with helicopter transportation of the shake bolts out of the woods. It is thus not completely accurate to suggest that claimant supplied all necessary equipment (see text to which note 1 refers, *supra)*.

Previously, on August 25, claimant had applied for unemployment compensation, at that time certifying on an application form that he had quit his job with Dexter on August 24. On August 28 claimant executed another form in connection with his unemployment compensation claim in which he stated he had done no work for Dexter during the week ending August 26 and instead had applied for jobs elsewhere on August 23 and 25. Although claimant testified that some of the entries on these forms were incorrect, we choose to accept the accuracy of the forms claimant signed.

It is also agreed that claimant never communicated his decision to quit to Dexter before he was injured.

The facts become hazy about what transpired between claimant's August 25 application for unemployment compensation and his August 31 injury. We find as follows: Some time between August 25 and 31 claimant returned to the woods only intending to pick up his tools and to follow through on his decision to quit. However, the other three members of the crew that claimant had been working with protested they would be unable to continue working themselves if claimant withdrew his tools from their informal "joint venture." The other crew members thus, in effect, persuaded claimant not to quit but, instead, to continue working with them as he had been.

How long they intended to continue is especially unclear. One possible inference is that the crew intended just to finish splitting the wood they had already cut so that they could be paid for it. That task was completed and the split shakes removed by helicopter on August 28. But the entire crew was back in the woods cutting trees down and splitting shakes when claimant was injured on August 31. So we deduce that the crew members, including claimant, must have agreed to continue with their work for Dexter indefinitely.

Claimant testified that he worked with the other members of his crew cutting on August 27, loading shakes to be flown out by helicopter on August 28 and again cutting on August 31. The referee and Board apparently did not find this testimony credible.[3] While there were reasonable grounds to doubt claimant's credibility, and we would usually defer to a referee's assessment of credibility, we note that one of Dexter's co-owners testified he observed claimant loading shakes to be flown out on August 28. Corroboration by one's adversary is the best possible corroboration. We thus accept claimant's testimony about his activities on August 28.

■ In sum, we find from the record: (1) claimant decided to quit his employment with Dexter on or before August 25, and on that date communicated that intent (as having already happened) in making a claim for unemployment compensation; (2) claimant never communicated his intent to quit to Dexter directly or indirectly, by word or act, before he was injured—indeed, the employer's observation of claimant on the job on August 28 would have communicated the exact opposite; (3) when claimant told the other members of his crew of his intent to quit, which we think most likely happened within a day or two of August 25, the other crew members persuaded claimant to stay on the job for some indefinite period; and (4) when claimant returned to the job site on August 28 and 31 it was pursuant to his change of mind and agreement with the other crew members to remain in Dexter's employ.

■■ On these facts the referee and Board perceived the legal issue as being whether claimant terminated his employment effective upon forming the intent to do so, or whether termination could only be effective upon communication to the employer. We see

---

[3] The referee stated: "* * * I find no proof from claimant's testimony alone that he was working for Dexter after the day he told the employment office he quit and before the day of the injury." The Board referred to claimant being "off the job site for a week," in context meaning between August 25 and 31.

[816]

the issue slightly differently. Unless and until there is some manifestation of intent, by words or acts, to exercise contract rights—including, as here, the right to terminate—we think a contracting party is free to vacillate or be indecisive about whether to do so. Stated differently, an uncommunicated intent to terminate a contract certainly has to be ineffective when the contracting party changes his mind and decides he no longer desires to terminate the contract.

That is exactly what we find happened in this case and, for that reason, we find claimant was still an employe of Dexter when he was injured.[4]

Affirmed.

_____
[4] Claimant cross-appeals from the denial of penalties. We agree with the analysis of the referee and the Board on this issue.